**ESSO STANDARD OIL COMPANY**

v.

**UNITED STATES.**

C.D. 2314; Protest Nos. 179898–K, 200887–K.

United States Customs Court, First Division.

Feb. 8, 1962.

Sharretts, Paley & Carter, New York City (Joseph F. Donohue, Eugene F. Blauvelt, and Howard C. Carter, New York City, of counsel), for plaintiff.

William H. Orrick, Jr., Asst. Atty. Gen. (Richard E. FitzGibbon, New York City, trial attorney), for defendant.

Before OLIVER, Chief Judge, and MOLLISON, and WILSON, Judges.

MOLLISON, Judge.

During the years 1951 and 1952, the plaintiff imported into the United States various shipments of fuel oil derived from petroleum, of which the shipments covered by the present protests are part, one importation (that covered by protest 179898–K) having been made on September 24, 1951, and the other (covered by protest 200887–K) on September 15, 1952.

The fuel oil involved had been produced in the Island of Aruba, a part of the Netherlands Antilles, which was, at that time, an overseas territory of the Kingdom of the Netherlands.

On the ground that annual quota amounts, which included crude petroleum, topped crude petroleum, and fuel oil de-

rived from petroleum, allocated by virtue of the Presidential proclamation relating to the trade agreement with Venezuela, T.D. 50015, 75 Treas. Dec. 165, to the Kingdom of the Netherlands, including its overseas territories, had been exhausted at the times of importation of the shipments here in question, the collector of customs took import tax at the rate of ½ cent per gallon on the said importations under section 3422 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 3422, as modified by the Presidential proclamation relating to the General Agreement on Tariffs and Trade, T.D. 51802, 82 Treas. Dec. 305.

The plaintiff contends that the customs authorities erred in interpreting the applicable law in that, at the times of the importations at bar, the quota amounts did not include fuel oil but only crude petroleum, and that the quotas so calculated had not been exhausted. Consequently, plaintiff contends, the fuel oil should have been assessed with duty at the rate of ¼ cent per gallon under said section 3422, as modified by the said T. D. 51802.

There is no dispute as to the facts of the matter, the sole question involved being the interpretation of the law.

Inasmuch as there are a number of somewhat lengthy designations of trade agreements, places, and things involved in the determination of the issues herein, for the sake of brevity, they will be hereinafter referred to in this decision as follows:

The term "Venezuelan Trade Agreement" shall mean the trade agreement with Venezuela and its related Presidential proclamation reported in 75 Treas. Dec. 165, T.D. 50015.

The term "general agreement" shall mean the General Agreement on Tariffs and Trade and its related Presidential proclamation reported in 82 Treas. Dec. 305, T.D. 51802.

The term "The Netherlands" shall mean the Kingdom of the Netherlands, including its overseas territories.

The term "topped crude" shall mean topped crude petroleum, and the term "fuel oil" shall mean fuel oil derived from petroleum, including fuel oil known as gas oil.

The background of statutory and proclaimed law and of fact is as follows:

Section 3422 of the Internal Revenue Code of 1939 imposed taxes upon the importation of petroleum and its derivatives as follows:

SEC. 3422. "Petroleum and derivatives.

"Crude petroleum, ½ cent per gallon; fuel oil derived from petroleum, gas oil derived from petroleum, and all liquid derivatives of crude petroleum, except lubricating oil and gasoline or other motor fuel, ½ cent per gallon; gasoline or other motor fuel, 2½ cents per gallon; lubricating oil, 4 cents per gallon; paraffin and other petroleum wax products, 1 cent per pound. The tax on the articles described in this section shall apply only with respect to the importation of such articles."

The foregoing provisions of the internal revenue code were several times the subject of trade agreement action taken under section 350 of the Tariff Act of 1930, as amended, 19 U.S.C.A. § 1351.

Effective on December 16, 1939, the tax applicable to importations of:

"Crude petroleum, topped crude petroleum, and fuel oil derived from petroleum including fuel oil known as gas oil"

was reduced to ¼ cent per gallon by the modification of section 3422, supra, contained in item 3422 of the Venezuelan Trade Agreement. The reduction, however, was subject to the following limitation:

"*Provided*, That such petroleum and fuel oil entered, or withdrawn from warehouse, for consumption in any calendar year in excess of 5 per centum of the total quantity of crude petroleum processed in refineries in continental United States during the

preceding calendar year, as ascertained by the Secretary of the Interior of the United States, shall not be entitled to a reduction in tax by virtue of this item, but the rate of import tax thereon shall not exceed $\frac{1}{2}$¢ per gallon."

Effective January 30, 1943, the tax imposed by section 3422 of the Internal Revenue Code of 1939 on:

"Crude petroleum, topped crude petroleum, and fuel oil derived from petroleum including fuel oil known as gas oil"

was fixed at $\frac{1}{4}$ cent per gallon, by virtue of first item 3422 of the Presidential proclamation putting into effect the trade agreement with the United Mexican States, T.D. 50797, 78 Treas. Dec. 190.

That trade agreement and its related proclamation, however, did not contain any proviso or language limiting the application of the reduced rate of tax, and, during its life, its effect was to suspend the application of the quota proviso in item 3422 of the Venezuelan Trade Agreement. United States v. Metropolitan Petroleum Corp., Herbert B. Moller, 42 C.C.P.A. Customs 38, C.A.D. 567.

The general agreement, effective January 1, 1948, contains a modification (item 3422) of section 3422, supra, fixing the rate of tax upon:

"Topped crude petroleum, fuel oil derived from petroleum including fuel oil known as gas oil, and àll liquid derivatives of crude petroleum (except lubricating oil and such derivatives specified hereinafter in any item 3422)"

at $\frac{1}{4}$ cent per gallon, with the following condition:

"*Provided*, That in no event shall the rate of import tax applicable under section 3422, Internal Revenue Code, or any modification thereof, to topped crude petroleum or fuel oil derived from petroleum be less than the rate of such tax applicable to crude petroleum."

Inasmuch as the tax applicable to crude petroleum was fixed, not by the general agreement and its related proclamation, but by the provisions of the then-existing trade agreement with the United Mexican States and its related proclamation, the tariff treatment of topped crude and fuel oil under the general agreement continued to be the same as under the Mexican agreement, i. e., $\frac{1}{4}$ cent per gallon with no quota limitation.

By action of the parties thereto, the Mexican Trade Agreement ceased to be effective on December 31, 1950, and the proclamation relating thereto was terminated by the President of the United States, T.D. 52559, 85 Treas. Dec. 252.

There is no dispute that, after the termination of the Mexican Trade Agreement, the rate of import tax on topped crude and fuel oil was governed by the provisions of the general agreement and fixed at $\frac{1}{4}$ cent per gallon, but not less than the rate applicable to crude petroleum.

It is clear, therefore, that, in order to determine the issues of this case, it is necessary to determine the rate of import tax applicable to crude petroleum *at the times here pertinent*, that is to say, after the termination of the Mexican Trade Agreement and while the provisions of item 3422 of the general agreement were in effect, but prior to the effective date of the supplementary trade agreement with Venezuela, which superseded item 3422 of the Venezuelan Trade Agreement and item 3422 of the general agreement. The supplementary trade agreement with Venezuela is reported in 87 Treas. Dec. 283, T.D. 53107. The pertinent times are from January 1, 1951, to October 10, 1952, both dates inclusive.

Both parties are in agreement that, at the pertinent times, the rate of import tax applicable to crude petroleum was controlled by a quota which was originally prescribed in the proviso to item 3422 of the Venezuelan Trade Agreement. The disagreement between the parties concerns the legal effect upon the prescrip-

tion of that quota of the proclamation of item 3422 of the general agreement.

There is no dispute between the parties as to the method by which the quota *amount* was to be determined. By the proviso to item 3422 of the Venezuelan Trade Agreement, the Secretary of the Interior was to ascertain the total quantity of crude petroleum processed in refineries in continental United States during the calendar year preceding the importations in question. By the terms of the proviso, importations of crude petroleum, topped crude, and fuel oil in excess of 5 per centum of such total quantity were not to have the benefit of the rate reduction prescribed in the first clause of item 3422 of the Venezuelan Trade Agreement.

It is not disputed that 5 per centum of the total quantity of crude petroleum processed in refineries in continental United States in the calendar year 1950 was ascertained to be 4,399,220,700 gallons, and in the calendar year 1951 was ascertained to be 4,977,848,400 gallons.

Nor is it disputed that the President of the United States had authority, under the Trade Agreements Act, as amended, and the trade agreements involved, to allocate the percentages of the foregoing total quota amounts which could be imported during the years 1951 and 1952 from countries under the trade agreements program, with entry at the reduced rate. Cited, in this regard is Greene Cattle Company, Inc. v. United States, 36 C.C.P.A. Customs 52, C.A.D. 397.

Accordingly, for the calendar years 1951 and 1952, the President allocated to the Netherlands 18.7 per centum of the total quota amount for 1951, or 822,654,-271 gallons (T.D. 52641, 86 Treas. Dec. 6), and the same percentage of the total quota amount for 1952, or 930,857,651 gallons (T.D. 52905, 87 Treas. Dec. 20). There is no dispute between the parties as to the accuracy of these amounts, or the propriety of their allocation.

It was stipulated by counsel for the parties that, at the times of importation of the merchandise at bar, the total *ag-gregate* quantity of crude petroleum, topped crude, and fuel oil imported from the Netherlands "did exceed the quota amounts allocated to the Netherlands." Plaintiff has established that, at the said times, the quantity of crude petroleum, considered separately, imported from the Netherlands was less than the quota amounts so allocated.

Plaintiff contends that the legal effect of item 3422 of the general agreement, when read together with item 3422 of the Venezuelan Trade Agreement, was to supersede, suspend, or render inoperative the provisions of the Venezuelan Trade Agreement relating to topped crude and fuel oil, both as to the rate of import tax applicable and as to inclusion within the quota limitation, leaving the rate and quota limitation of the Venezuelan Trade Agreement applicable only to crude petroleum. In this situation, the rate of import tax applicable to crude petroleum would rise to ½ cent a gallon only when importations of crude petroleum exceeded the quota amount allocated.

Defendant contends that the proclamation of item 3422 of the general agreement resulted in no change from the situation which obtained under item 3422 of the Venezuelan Trade Agreement; that the quota continued to be applicable to importations of crude petroleum, topped crude, and fuel oil; and that the rate on all three products rose to ½ cent a gallon when importations of an aggregate of the said three products exceeded the quota amount allocated.

It will thus be seen that both parties agree that the issue involves the language of item 3422 of the Venezuelan Trade Agreement and item 3422 of the general agreement, but derive different meanings from that language. Consequently, an analysis of the involved language is in order.

The first clause of item 3422 of the Venezuelan Trade Agreement modifies the provisions of section 3422 of the Internal Revenue Code of 1939 by reducing the rate of import tax applicable to "Crude petroleum, topped crude petroleum, and

fuel oil derived from petroleum including fuel oil known as gas oil" from ½ cent per gallon to ¼ cent per gallon.

The proviso of that item, however, imposes a limitation upon the quantity of the named products which may be imported at the reduced rate. The limitation takes the form of an annual quota of imported products to which the reduced rate will be applied, *but it does not in so many words provide for such an annual quota.* Instead, it provides that "such petroleum and fuel oil" imported *in excess* of the annual quota amount shall *not* be entitled to the reduced rate of tax "by virtue of this item."

■ It follows, therefore, that importations of "such petroleum and. fuel oil" *not in excess,* i. e., which are *within,* the quota amount are the only importations to which the rate reduction and the quota apply by virtue of that item.

We need not consider the effects of the Mexican Trade Agreement upon that situation, inasmuch as those effects were canceled upon the termination of that agreement. Consequently, we need consider only the effect of item 3422 of the general agreement upon item 3422 of the Venezuelan Trade Agreement, with respect to importations of fuel oil made after January 1, 1951.

■ The first thing to be noticed about item 3422 of the general agreement is that, in the first clause thereof, topped crude and fuel oil are associated with petroleum products, other than crude petroleum, i. e., "all liquid derivatives of crude petroleum (except lubricating oil and such derivatives specified hereinafter in any item 3422)." Second, the rate of import tax applicable to crude petroleum is not fixed or covered in any way by item 3422 of the general agreement. Third, the rate fixed as applicable to topped crude, fuel oil, and liquid derivatives of crude petroleum is not made dependent upon any quota. Fourth, the only condition upon the rate applicable to topped crude and fuel oil is that it shall not be less than that applicable to crude petroleum.

From the foregoing, it is manifest that it was the purpose and the legal effect of item 3422 of the general agreement to suspend the operative provisions of item 3422 of the Venezuelan Trade Agreement, insofar as they related to topped crude and fuel oil, except that the rate applicable to those two products was tied to the rate applicable to the only product remaining within the purview of item 3422 of the Venezuelan Trade Agreement, to wit, crude petroleum.

A consequence of the limitation of item 3422 of the Venezuelan Trade Agreement to the one article, crude petroleum, was that the quantity of imports described in the proviso as entitled to the rate reduction *effected by that item* was necessarily a quantity of crude petroleum only.

The language of the proviso requires this. It states that importations in excess of the quota quantity "shall not be entitled to a reduction in tax by virtue of this item." This limited the ¼ cent rate to importations within the quota quantity. Importations of what? Obviously, importations of articles entitled to the reduction *under the provisions of that item.* After January 1, 1951, this was crude petroleum only.

Construing *in pari materia* item 3422 of the Venezuelan Trade Agreement and item 3422 of the general agreement, after January 1, 1951, the Venezuelan Trade Agreement fixed a rate of duty of ¼ cent per gallon on crude petroleum and then fixed the annual quantity entitled to such rate. Imported crude in excess of such quantity was taxed at ½ cent per gallon. The general agreement taxed topped crude and fuel oil at ¼ cent per gallon, but at not less than the rate applicable to crude. Thus, if crude petroleum imports for the calendar year reached the quota quantity and the rate of duty on subsequent imports of crude petroleum advanced to ½ cent per gallon, the rate on topped crude and fuel oil would advance, *by virtue of the general agreement,* to equal the rate on crude petroleum. The rate on topped crude and fuel oil was not limited by a quota. It was subject only

to a proviso that it should not be less than the rate on crude petroleum.

The defendant's position is, in general, as follows: It acknowledges that the general agreement controlled the customs treatment of topped crude and fuel oil between January 1, 1951, and October 10, 1952. It, nevertheless, urges that, during the same period, the quota quantities to be counted as establishing the rate of import tax on crude petroleum *under the Venezuelan Trade Agreement* included not only importations of crude petroleum, but topped crude and fuel oil as well.

The necessary result of the defendant's position would be that, during the times here pertinent, item 3422 of the general agreement, insofar as it related to topped crude and fuel oil, would be given no effect. The Venezuelan Trade Agreement would be construed to cover all importations of crude petroleum, topped crude, and fuel oil. According to the defendant, the general agreement would not operate on topped crude and fuel oil at all. If the realization of the defendant's position had been the intention, that result most obviously would have been easily and lawfully accomplished *by simply omitting topped crude and fuel oil from item 3422 of the general agreement entirely*. The *status quo* of the Venezuelan Trade Agreement would then have been maintained and, on the termination of the Mexican Trade Agreement, the Venezuelan Trade Agreement would have been the operative authority for the customs treatment of crude petroleum, topped crude, and fuel oil.

But this conclusion cannot be reached by treating item 3422 of the general agreement as having no force and effect, insofar as it related to topped crude and fuel oil. That item unquestionably controlled the customs treatment of those products, and the United States certainly did not execute the general agreement with an intention that some of its provisions would be ignored or rendered meaningless.

Item 3422 of the general agreement did not repeat the provisions of either the Venezuelan or Mexican Trade Agreement but it made new provisions which, after January 1, 1951, provided for topped crude and fuel oil, leaving only crude petroleum to the Venezuelan Trade Agreement. Effect must be given to these provisions, which quite obviously contemplate that the rate of tax applicable to crude petroleum would be determined on a basis or formula under which importations of topped crude and fuel oil were not rate-making factors.

Plaintiff has shown that, during 1951, imports of crude petroleum from the Netherlands totaled 3,696 gallons, and that, up to October 11, 1952, imports of crude petroleum totaled 61,219,326 gallons. The quota of importations proclaimed to be entitled to the reduced rate under the Venezuelan Trade Agreement was 822,654,271 gallons for 1951, and 930,857,651 gallons for 1952. Since imports of crude petroleum from the Netherlands never equaled the quota quantity during either year, all of such imports during said years were dutiable at $\frac{1}{4}$ cent per gallon.

Imports of fuel oil during the same period were dutiable at $\frac{1}{4}$ cent per gallon, by virtue of the general agreement. Accordingly, the fuel oil in the two protests at bar was properly dutiable at $\frac{1}{4}$ cent per gallon, as claimed, rather than at $\frac{1}{2}$ cent per gallon as assessed.

Judgment will issue accordingly.